NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In re the Marriage of:

GORDON M. DAWSON, IV, *Petitioner/Appellant,*

*v.*

CHERYL M. DAWSON, *Respondent/Appellee.*

No. 1 CA-CV 23-0045 FC
FILED 12-05-2023

Appeal from the Superior Court in Mohave County
No. L8015DO202107247
The Honorable Megan A. McCoy, Judge

**AFFIRMED**

COUNSEL

Slaton Roebuck PLLC, Scottsdale
By Sandra Slaton, Kristen Roebuck Bethell, Isaac Gilbert,
Matthew J. Monaco
*Counsel for Petitioner/Appellant*

Silk Law Office, Lake Havasu City
By Melinda Silk
*Counsel for Petitioner/Appellant*

DeShon Laraye Pullen PLC, Phoenix
By DeShon L. Pullen
*Counsel for Respondent/Appellee*

Hoffman Legal, LLC, Phoenix
By Amy W. Hoffman
*Counsel for Respondent/Appellee*

---

**MEMORANDUM DECISION**

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Chief Judge David B. Gass joined.

---

**J A C O B S**, Judge:

¶1        Gordon Dawson ("Husband") appeals the superior court's decree of dissolution, arguing the court erred in its valuation of Hospitality Construction, Inc. ("HCI"), a business he and Cheryl Dawson ("Wife") owned. Husband argues the court erroneously adopted Wife's expert's report because it used a three-year lookback to value HCI, instead of using the single year on which his expert relied. Husband also argues the decree lacked the specificity our law requires, rendering it unreviewable. Because the superior court acted within its discretion in valuing HCI as Wife's expert did, we affirm the decree.

## FACTS AND PROCEDURAL HISTORY

¶2        Husband and Wife married on September 23, 2000. Husband formed HCI in 2018. He filed a petition for dissolution of non-covenant marriage without children on November 8, 2021 in the Mohave County Superior Court. A primary object of contention in the divorce proceedings was HCI's value.

### A.    HCI Earned Substantial Revenue and Profit Over the Years 2019 to 2021.

¶3        HCI provides construction services to hotels. Since its beginning, HCI has had only one client, Good Nite Inn ("GNI"). HCI does not have contractor's license and instead operates under GNI's contracting license. GNI sold four hotels between August 2020 and August 2021. Those sales yielded $1,288,324 of revenue in 2020 and $883,202 of revenue in 2021. HCI also stopped servicing three other GNI facilities (Redwood City, Fremont, and Rohnert Park) in 2020.

**¶4**        HCI's revenue and profit history would figure prominently in the expert valuations of it during this litigation.  In 2019, HCI grossed $3,714,082 and realized a net income of $443,492.  In 2020, HCI grossed $3,782,285 and realized a net income of $580,337.  In 2021, HCI grossed $2,630,449 and realized a net income of $121,057.  In 2022, HCI grossed $1,935,398 during the 10-month partial year that preceded trial.

### B.        Husband's and Wife's Experts Disputed HCI's Value Using Different Valuation Methods.

**¶5**        Husband and Wife hired experts to value HCI.  Wife hired Lynton Kotzin, and Husband hired Frank Pankow.  Kotzin valued HCI using the years 2019 to 2021, and Pankow used only 2021 – the low-revenue year.  Both determined HCI's fair market value, and separately, its fair value.  Fair market value is the price at which a business would sell if neither buyer nor seller were under compulsion to sell.  Fair value is the investment value.  Kotzin's report found HCI's fair market value was $2,399,000, and its fair value was $2,823,000.  Pankow found HCI's fair market value was $642,000, and its fair value $755,000.

**¶6**        Kotzin's business valuation adhered to the appraisal development standards of Uniform Standards of Professional Appraisal Practice ("USPAP").  Kotzin chose October 31, 2021 as the date of valuation because it was the last end-of-month date before Husband filed and served the petition for dissolution.  In his valuation report, Kotzin provided a list of sources that he used to calculate HCI's value including HCI financial statements, federal income tax returns, QuickBooks files, transaction reports, bank accounts, and a variety of other documents.  The report identified procedures Kotzin used to arrive at HCI's value which included, but were not limited to, analyses of the general economic environment, non-residential construction industry, and the historical and projected financial condition of HCI.  This analysis met the requirements of a Valuation Engagement as defined by Statement 1 on Standards for Valuation Services as issued by the American Institute of Certified Public Accountants.

**¶7**        Kotzin's report also highlighted a potential conflict of interest by Neige Bufano, the facilities manager for GNI.  Kotzin understood Bufano to be romantically involved with Husband and thus questioned "Bufano's role in awarding contracts for GNI and in her response to the subpoena from GNI in this matter."  At trial, Husband testified Bufano was not his girlfriend, but that they had a relationship in 2018.

¶8          Kotzin's report identified HCI's fixed and non-operating assets such as a 2020 Ford F350 Crew Cab, Raptor Ford F-150, Silver Ford F-150, and a Cessna airplane. His report states, "It is our understanding that the 2020 Ford F350 Crew Cab is not utilized for the business operations" and the Cessna was "utilized approximately 70% of the time for business and 30% of the time for personal" and "[t]herefore, we have considered the Cessna to be an operating asset but have removed 30% of the related expenses." Husband testified all three vehicles were used for business. Husband failed to provide flight logs for the Cessna but testified it was used for business 98% of the time. Kotzin's report thus took account of all of these vehicles in valuing HCI.

¶9          Pankow commented for Husband on Kotzin's report. Pankow's response stated his comments on Kotzin's report did not qualify as a "review" under USPAP Standard No. 3. Pankow pointed out he interviewed Husband, Ms. Bufano, and Ms. Elizabeth Gutierrez, GNI's human resource director, and that by contrast, Kotzin did not interview Husband or GNI personnel.

¶10         Pankow's report highlighted HCI's limited nature as a "one man shop" that could only operate under GNI's contracting license. Further, the report commented on several factors negatively impacting HCI's value: the sale of four hotels, the effect of Covid-19 on GNI, and the Cessna's need for an overhaul. Pankow's report states that for these and other reasons, "Kotzin should have excluded the fiscal years 2019 and 2020 from his analysis."

### C.      The Superior Court Heard From Both Experts at Trial.

¶11         The superior court held a trial on September 26, 2022. Kotzin and Pankow both testified as to the value of HCI and their respective methods. Kotzin testified he used a three-year average to determine the value because excluding 2021 would not give "a reasonable value indication" and looking at multiple years provided "a basis for projecting future cash flow." Kotzin also explained he used a different discount rate for a three-year scenario rather than the two-year scenario because a two-year scenario was riskier. Kotzin explained using only the year 2021 was not an analytically "viable scenario." Additionally, Kotzin justified why he did not use the market approach or asset approach. In his experience, the market approach would not be comparable because of the lack of comparable transactions, and the asset approach would not provide a full picture as to HCI's intangible assets.

¶12 Kotzin testified to the value of HCI given his review of industry research, GNI's website, and other analysis. Kotzin explained Pankow's review was not accurate because Pankow's report did not adhere to the USPAP. Further, though Pankow adopted Kotzin's calculations and conclusions, he only chose the year 2021 but used Kotzin's discount rate for a three-year average, even though Kotzin believed a lower discount rate would be suitable for a one-year low period because of increased risk.

¶13 As to the Cessna, Kotzin explained he used calculations that assumed 70% business use and 30% personal use because Wife testified it was used for both. Kotzin was forced to pick a framework because Husband refused to provide flight logs which would have ensured a more precise allocation. Kotzin also testified that the value of the Cessna was reported at $449,639 based on an appraisal Wife obtained.

¶14 Pankow responded that HCI has only one client (GNI), operates solely under GNI's contractor's license, and that sales of hotels peaked in a twelve-month period straddling 2019 and 2020. Pankow testified his discussions with GNI employees showed a "structured hierarchy" and that the "decisions [were] made in a very prescribed manner." Pankow also testified the Cessna needed a costly overhaul. Pankow explained he did not follow USPAP standards because they are restrictive, but used Kotzin's report to illustrate what the result would be if the business was valued using only the year 2021.

**D. The Superior Court Entered a Dissolution Decree Equitably Dividing Community Assets While Adopting Kotzin's Valuation of HCI Over Pankow's.**

¶15 The superior court entered a decree of dissolution on November 29, 2022. Neither Husband nor Wife were awarded spousal maintenance. The court found the circumstances called for an equal division of community property as was appropriate to achieve equity.

¶16 Husband was awarded HCI. The superior court found Kotzin's evaluation "credible" and found it was inappropriate to look to the lowest income year to determine the value of HCI because this would "lead to inequitable division of assets." Husband concedes the superior court adopted Kotzin's evaluation of HCI, arguing "[t]here is no substantial evidence that supports the trial court's decision to adopt Wife's expert opinion and report." By adopting Kotzin's opinion, the superior court valued HCI at $2,399,000, its fair market value, or

$2,823,000, its fair value instead of Pankow's fair market value of $642,000, or his fair value of $755,000.

¶17        As to the parties' other assets, the court awarded Wife a Lake Havasu home and furnishings valued at $1 million, and the Islander Mobile Home and its furnishings valued at $415,000.  The court awarded Husband and Wife their separate property, as well as retirement accounts in their separate names.  Husband and Wife were ordered to equally divide credit card miles, rewards, points, and any remainder left in community financial accounts.  The decree did not explicitly identify the F-350 and F-150 trucks, but it did award all vehicles to Husband and Wife that were currently in their possession, thus including the trucks and the Cessna.  Relatedly, though Kotzin's analysis treated the Cessna as part of HCI's value, the court made a specific finding that it was "not used exclusively for business purposes," given Husband's withholding of the flight logs that would have shed more light on the specifics of his use of it.

¶18        The superior court then adjusted this allocation of real and personal property, which it found was "not fair and equitable under the circumstances," awarding Wife a $300,000 equalization payment from Husband, to be provided to Wife in six separate annual $50,000 payments.

¶19        After tallying all of these divisions and adjustments, the court awarded both parties an almost identical amount, granting Husband $3,182,261.85 and Wife $3,192,893.29, if one inputs Kotzin's lower value for HCI (its fair market value of $2,399,000).

## DISCUSSION

¶20        Community property is divided "equitably, though not necessarily in kind, without regard to marital misconduct."  A.R.S. § 25-318(a).  We review the division of community property for an abuse of discretion.  *Boncoskey v. Boncoskey*, 216 Ariz. 448, 451 ¶ 13 (App. 2007).  Within that division, we review the superior court's "determination of the value of a business in a divorce proceeding for an abuse of discretion." *Schickner v. Schickner*, 237 Ariz. 194, 197 ¶ 13 (App. 2015).  "[T]he superior court has wide discretion to choose a business's valuation date, so long as the ultimate valuation is equitable." *Meister v. Meister*, 252 Ariz. 391, 397 ¶ 18 (App. 2021).

### A. The Court Did Not Abuse Its Discretion by Adopting Kotzin's Analysis, and With It, His Valuation of HCI.

¶21        Husband argues the superior court failed to sufficiently support its decision to include 2019 and 2020 income, failed to give a valuation date, and failed to state the value of HCI.  Husband argues this lack of information makes the decree impossible to review.  We conclude the superior court's adoption of Kotzin's three-year analysis fell within its discretion.  We also conclude the superior court, by adopting Kotzin's evaluation, ratified the particulars of Kotzin's analysis and valuation.  Though ratification is not a best practice, we find it sufficient here.

### B. The Superior Court Did Not Abuse Its Discretion by Adopting a Three-Year Valuation Average for HCI.

¶22        Husband suggests that in valuing HCI, only the lowest revenue year should have been considered, as Pankow proposed.  Husband contends it is so because "averaging of multiple years is not utilizing the most 'current and accurate information available.'"  Making this argument, Husband relies heavily on *Meister*.  *See* 252 Ariz. 391, 396-97 ¶¶ 12-18.  There, we held the superior court erred when it did not consider significant changes in a community business that occurred about a month after divorce proceedings began, and almost two years before trial, and thus erred in the valuation of the community business.  *Id.* at 397 ¶ 19.  In *Meister*, husband's expert chose a valuation date that showed the effects of the community business losing a contract, but wife's expert chose a date that was closest to the date of service that began the dissolution proceeding.  *Id.* at 395 ¶¶ 7-8.  We explained the superior court "may use the date of service, or date near the date of service, as a starting point in choosing the valuation date . . . [b]ut the court must select a different date when necessary to ensure an equitable result."  *Id.* at 397 ¶ 18.  We held wife's proposed valuation date was incorrect because it did not consider the substantial financial losses that occurred shortly after the petition for dissolution, or the lost contract attributed to husband's overbilling practices that occurred while the parties were married.  *Id.* at ¶ 19.

**¶23** *Meister* does not lead us to conclude that the three-year period the superior court used here was an abuse of discretion. HCI still has a contract with GNI, which is the principal source of its past revenue, making a longer-term look at HCI's work with GNI arguably helpful. Moreover, unlike *Meister*, Husband points to no transformational event in HCI that happened after the petition for dissolution. Additionally, Kotzin analyzed the historical and projected financial condition of HCI, as well as HCI's historic and projected earnings and cash flow, which helped Kotzin determine the value of the business. Kotzin also testified Pankow's report used his calculations, but failed to calculate a separate and independent discount rate and that it was not an appropriate "apples to apples comparison." Further, Kotzin testified that HCI had room for revenue growth from its one bad year because industry research looked "very positive" in the coming years. By accepting the totality of Kotzin's analysis, the superior court did not abuse its discretion because it provided sufficient reasoning as to why it adopted Kotzin's three-year approach.

### C. Sufficient Evidence Supports the Superior Court's Adoption of Kotzin's Value of HCI and His Selected Valuation Date.

**¶24** We likewise reject Husband's argument that insufficient evidence supports the decree's analysis, requiring us to reverse it. Husband correctly directs us to the controlling case, *Meister*. In *Meister*, we explained that "[a]bsent a proper request from a party that triggers mandatory 'separate findings of fact and conclusions of law,' no bright-line rule exists as to what a court must include in addressing whether a selected valuation date is equitable." 252 Ariz. at 400 ¶ 30 (quoting Ariz. R. Fam. Law P. 82(a)(1)). We further explained "the court must provide enough analysis, however labeled, to allow an appellate court to fulfill its obligation to decide whether the valuation date, and resulting property distribution, withstand the test of equity and fairness." *Id.* Even so, "[s]pecific analysis addressing the test of equitableness may not always be required . . . if reasonable evidence is readily apparent from the record that the selected date of valuation and resulting value are equitable." *Id.* at 400 ¶ 30 n.4.

**¶25** Though the superior court's decree is not a model of detail, its adoption of Kotzin's analysis of HCI was not an abuse of discretion because the required "reasonable evidence is readily apparent" within Kotzin's report. *See Meister*, 252 Ariz. at 400 ¶ 30 n.4. The superior court carefully considered Kotzin's and Pankow's evaluation and exercised its

discretion by finding Kotzin's assessment "credible," explaining Kotzin's approach considered the nature of small businesses, and that the asset approach used by Pankow "[missed] the reality of what this business is worth." In the decree, the superior court acknowledged the "wildly different estimates" each party provided as to the value of HCI and referenced testimony that considered "whether the high years were the outliers, or whether the low year was the outlier." Additionally, the superior court explained why Kotzin's three-year average was more appropriate: it "[did] not find that only looking to the lowest income year is the appropriate valuation, but would only benefit Husband and lead to inequitable division of assets." This was the superior court's call to make, and its order shows the court made the required effort to analyze the parties' competing theories.

¶26        Our conclusion that the superior court did not abuse its discretion when it did not state a value or valuation date for HCI in the decree is reinforced by the lack of any request by either party for findings of fact or conclusions of law. *See* Ariz. R. Fam. Law P. 82(a). When neither party requests findings of fact and conclusions of law, "on appeal the court must assume the trial court found every fact necessary to support its judgment and must affirm if any reasonable construction of the evidence justifies the decision." *Stevenson v. Stevenson*, 132 Ariz. 44, 46 (1982). We thus assume the superior court adopted the premises in Kotzin's report upon which his valuation rested. From there, we affirm the decree "if there is reasonable evidence to support such [findings]." *Bender v. Bender*, 123 Ariz. 90, 92 (App. 1979). Kotzin's report and testimony contained "reasonable evidence" to support his valuation. *Gutierrez v. Gutierrez*, 193 Ariz. 343, 347 ¶ 13 (App. 1998) (explaining we defer to the trial court's determination of witness credibility and weighing of conflicting evidence). For these reasons, the superior court did not abuse its discretion by adopting Kotzin's analysis in the decree.

¶27        Finally, we reject Husband's contention that assets like the Cessna and trucks were not awarded because they were not specifically listed in the decree. The Cessna, which was deemed a mixed personal and business asset because Husband failed to provide flight logs for it, was factored into Kotzin's business valuation. Similarly, Kotzin's report factored the trucks into the business valuation. They were thus included within the award of HCI to Husband. Moreover, the decree awarded Husband and Wife all vehicles that were already in their possession, thus including the trucks and the Cessna, to the extent more specific reference to them was necessary.

## CONCLUSION

**¶28**　　　We affirm.　After considering the positions Husband has taken on appeal, as well as the parties' financial resources, we exercise our discretion to deny Wife's request for attorneys' fees and costs under A.R.S. § 25-324.

